**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

EVELYN BRADY, as Personal
Representative of the ESTATE OF
ROMMELL JOHNSON, on behalf of the
Estate, and on behalf of Rommell Johnson's
Survivor, Evelyn Brady,

       Plaintiff,

vs.                             Case No.:  4:11-cv-00510-RH-WCS

FLORIDA DEPARTMENT
OF CORRECTIONS, an Agency
Of the State of Florida, and
VIVAN OGG, in her individual capacity,

       Defendants.

_____/

## THIRD AMENDED COMPLAINT

### with

### JURY DEMAND

### Introduction

1.     Rommell Johnson ("Rommell"), a 44 year old asthmatic inmate, died in the custody of the Florida Department of Corrections ("FDOC") on June 3, 2010, as a direct result of two uses of chemical agents against him within a five-minute period, and Defendant Vivan Ogg's refusal to provide him with urgent medical care when the need for such care was plainly obvious.  Both Defendant FDOC and Defendant Ogg knew of Rommell's asthma, knew that chemical agents exacerbated his asthma symptoms, and knew that he had an asthma attack earlier that very same day.  Despite that knowledge, agents of the FDOC used these chemical

agents on Rommell, knowing full well that chemical agents can be fatal to asthmatics and deliberately failed to provide him a reasonable accommodation for his disability.  Moreover, after the chemical agents were applied, Defendant Ogg ignored the obvious fact that Rommell was in respiratory distress and acted with deliberate indifference when she refused to provide him with the very medical care she knew he so urgently needed.  According to the District Fourteen Medical Examiner, Rommell suffered this untimely death as the result of "status asthmaticus associated with inhalation of chemical agents."  In other words, the chemical agents triggered a severe asthma attack, and he suffocated to death.

2.     On August 29, 2011, Plaintiff filed suit against Defendant FDOC in the Second Judicial Circuit in and for Leon County, for the grossly negligent treatment of the decedent resulting in his wrongful death, while incarcerated at the Northwest Florida Reception Center in Chipley in violation of Florida's Wrongful Death Act, Sections 768.16-768.27, Florida Statutes, and for FDOC's deliberate indifference to the decedent's need for a reasonable accommodation in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

3.      On October 6, 2011, Defendant FDOC removed the matter to this Court based on federal question jurisdiction.  *See* Notice of Removal (D.E. 1).

## Parties

4.     Plaintiff Evelyn Brady is the duly appointed Personal Representative of the Estate of Rommell Johnson, having been appointed Personal Representative by the Probate Division of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, File No. 11-001510.  This action is brought by Evelyn Brady, mother of Rommell Johnson, in her capacity as Personal Representative of the Estate of Rommell Johnson, on behalf of the Estate of Rommell Johnson, and on behalf of his survivor, Evelyn Brady.

5.     At all times material to this action, Rommell was an inmate in the custody of the FDOC.  Rommell was housed at Northwest Florida Reception Center in Chipley, Florida, a correctional institution operated by the FDOC.

6.     Defendant FDOC is an Agency of the state of Florida, subject to suit for negligence pursuant to Section 768.28 of the Florida Statutes.  As a public entity, Defendant FDOC is subject to suit for damages pursuant to Title II of the Americans with Disabilities Act, and as a recipient of federal funds, Defendant FDOC is subject to suit for damages pursuant to Section 504 of the Rehabilitation Act.  Plaintiff has fully and timely complied with the notice requirements of Section 768.28 of the Florida Statutes.  *See* Exhibit A.

7.     Defendant Vivan Ogg is a Registered Nurse in the State of Florida who, at all times material to this action, was responsible for inmate health care at Northwest Florida Reception Center.  Defendant Ogg was at all times material to this action employed by the Defendant FDOC.  Defendant Ogg is sued in her individual capacity.

## Jurisdiction and Venue

8.     Plaintiff has complied with all applicable pre-suit notice provisions of Section 768.28, Florida Statutes.

9.     This Court has jurisdiction over this matter under the following:

a.     28 U.S.C. § 1331, as this is a civil action arising under the Constitution, laws, and/or treaties of the United States;

b.     28 U.S.C. § 1337, as this is a civil action or proceeding arising under an Act of Congress regulating commerce and/or protecting trade and commerce against restraints and monopolies; and

c. 28 U.S.C. § 1343, as this is a civil action seeking to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom and/or usage, of a right, privilege or immunity secured by the Constitution of the United States and/or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

10. Plaintiff's claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

11. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as Defendant does business in this judicial district and the events or omissions giving rise to the claims occurred in this judicial district.

13. Plaintiff's claims for relief are predicated, in part, on Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and 42 U.S.C. § 12205, which authorizes the award of attorneys' fees and costs to a prevailing plaintiff in actions brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

14. Plaintiff's claims for relief are predicated, in part, on Section 504 of the Rehabilitation Act, and Section 505 of the Rehabilitation Act, 29 U.S.C. § 794a, which authorizes the award of attorneys' fees and costs to a prevailing Plaintiff in actions brought pursuant to Section 504 of the Rehabilitation Act.

## Facts

### *What is Asthma?*

15.     According to the National Heart Lung and Blood Institute, asthma is a chronic (long-term) lung disease that inflames and narrows the airways, which can be fatal.  Asthma causes recurring periods of wheezing (a whistling sound during breathing), chest tightness, shortness of breath, and coughing.  The symptoms of asthma are exacerbated by environmental toxins, such as chemical agents.

16.     Asthma impairs one or more major life activities, including, but not limited to breathing.

### *FDOC Policy Regarding the Use of Chemical Agents*

17.     The FDOC has various methods for quelling a disturbance in non-emergency situations.  Among those methods is the use of chemical agents, including Oleoresin Capsicum, Orthochlorbenzal Malononitrile, Orthochlorobenzylidene Malononitrile, and Cloroacetophene.

18.     Oleoresin Capsicum is an inflammatory agent that causes tearing and involuntary closing of the eyes, nasal discharge, sneezing, disorientation, and the sensation of respiratory distress.

19.     Orthochlorbenzal Malononitrile and Orthochlorobenzylidene Malononitrile are irritant agents that cause eyes to burn and tear, nasal discharge, and skin and upper respiratory irritation.

20.     Cloroacetophene is a lacrimator agent that causes tearing of the eyes, nasal discharge, and skin and upper respiratory irritation.

21.     The effects of the chemical agents are so severe that, pursuant to the FDOC Rules, after an inmate is gassed, corrections officers are required to offer the inmate a cool water

shower and medical examination, and, if necessary, move the inmate from the contaminated cell to a clean cell.

22.    Despite the known risks chemical agents pose to asthmatics, Defendant FDOC does not have a policy of designating all known asthmatics as being contraindicated for chemical agents.   As a result of the FDOC's policy, some asthmatic inmates are designated as being contraindicated for chemical agents, while others are not; and some asthmatic inmates are designated as being contraindicated for chemical agents at certain points in time, and are not contraindicated at other points in time.

23.    Accordingly, Defendant FDOC provides for a chemical agents risk assessment form to be completed each time an inmate is sent to a confinement setting.  The form indicates whether an inmate is contraindicated for chemical agents.  However, the decision is left solely to the health care practitioner completing the form, and the health care practitioner is permitted to indicate that an inmate is not contraindicated for chemical agents, even if the inmate has asthma, and despite the known risks chemical agents pose to asthmatics.  These decisions are almost exclusively made by licensed practical nurses.

24.    In August of 2009, for example, medical personnel determined that Rommell Johnson required a five day stay in an Isolation Management Room in the Infirmary, due to the severity of his asthma.  Shockingly, despite that fact, Rommell's chemical agents risk assessment form, completed the day he was admitted to the infirmary, indicated that he was not contraindicated for the use of chemical agents.

25.    Rule 33-602.210(21)(n)(2)(a), F.A.C., a use of force policy authorized by the FDOC, further states that when an inmate is housed in a confinement setting, staff must review the same chemical agents risk assessment form prior to use of chemical agents to determine if the

inmate has a medical condition that would be exacerbated by the use of chemical agents. However, even if the inmate is noted to have such a medical condition and is contraindicated for chemical agents, chemical agents may still be used, despite this knowledge.

26.     It is against this backdrop of deliberately indifferent and contradictory FDOC policies that chemical agents were allowed to be used against Rommell Johnson on the day of his death, despite the Defendant FDOC's knowledge of his serious asthma condition and the known and deadly risks that chemical agents pose to asthmatics.

### Rommell's Asthma History

27.     Rommell had a life-long history of chronic and severe asthma, and Defendant FDOC was made aware of that fact when he was placed in FDOC custody in 2004. Accordingly, when Rommell was received by the FDOC in 2004, he was diagnosed by the Defendant FDOC with chronic, moderate to severe asthma. Defendant FDOC maintained Rommell's diagnosis of having moderate to severe asthma continually throughout his incarceration from 2004 through the date of his untimely death in 2010. Rommell was also diagnosed by Defendant FDOC as bi-polar.

28.     Asthma impaired one or more of Rommell's major life activities including, but not limited to, breathing.

29.     Rommell was a regular patient of the Defendant FDOC's respiratory clinic for difficulty breathing due to asthma.

30.     Rommell required the regular use of his FDOC-prescribed inhaler, because he had trouble breathing due to asthma.

31.     Defendant FDOC repeatedly admitted Rommell to its infirmaries, because he required oxygen and nebulizer treatments to combat his asthma.

{07051229;5}

32.     Defendant FDOC knew that chemical agents exacerbated Rommell's asthma specifically, as a nurse attributed his continued cough to chemical agents being used on other inmates in confinement.

33.     Defendant FDOC was aware that Rommell's asthma required various accommodations.  Defendant FDOC's medical staff exempted Rommell from outside ground work in 2008 and 2009 due to the severity of his asthma.  Moreover, Defendant FDOC, from time to time, provided Rommell with a low bunk pass, and lower floor housing, as an accommodation for his disability.

34.     Despite his severe asthma, Defendant FDOC never exempted Rommell from the use of chemical agents which exacerbated his condition as a reasonable accommodation for his severe disability.  In fact, for the majority of Rommell's incarceration, and consistent with FDOC policy, Defendant FDOC did not even designate Rommell as being contraindicated for the use of chemical agents, despite the fact that Defendant FDOC acknowledged that he suffered from moderate to severe asthma at all times, and despite the known risks that those chemical agents posed to asthmatics.

### Rommell's Tragic and Painful Death

35.     On June 3, 2010, Rommell Johnson suffered an untimely death as the result of "status asthmaticus associated with inhalation of chemical agents" while confined alone in his cell in the custody of the FDOC.

36.     On June 3, 2010, Rommell was not designated as being contraindicated for chemical agents, despite the fact that Rommell was a known asthmatic and experienced breathing problems associated with his chronic asthma, and despite the fact that Rommell had required medical intervention on that very afternoon for difficulty breathing.  The FDOC's

policy of not providing a reasonable accommodation for severe asthmatics by allowing them to be gassed with chemical agents permitted this to occur.

37.     On the date of his death, Rommell was housed at the Defendant FDOC's Northwest Florida Reception Center, in solitary confinement in Close Management.

38.     Close Management cells are fully enclosed, approximately 5' x 7' cells, with only a Plexiglas window in the otherwise solid, steel door and a steel food-flap which is usually closed and locked from the outside.

39.     On June 3, 2010 at approximately 1:50 p.m., Rommell declared a medical emergency because he was having an asthma attack.

40.     Defendant FDOC medical staff completed a respiratory assessment of Rommell and determined that he required the use of prescription medication to assist him with his breathing.

41.     Rommell was taken out of his dorm, given a nebulizer treatment with nurse assistance in the medical building, and then was returned to his cell.  Although FDOC staff noted that Rommell's asthma inhaler was empty, there was no replacement at the institution, and because his inhaler had been recently replaced, he would not be provided with one for another thirty days.  The nurse, who later noted that she thought Rommell was faking his respiratory emergency despite his dangerously low oxygen levels, told Rommell to declare a medical emergency if he had any future problems breathing.  The nurse documented her interaction with Rommell and placed the documentation into his file immediately.

42.     Despite being made aware of this attack, Defendant FDOC did not change Rommell's chemical agents risk assessment form, and continued to have him designated as not being contraindicated for chemical agents.

{07051229;5}

- 9 -

43.     Less than three hours later, at approximately 4:22 p.m., Rommell was allegedly causing a disturbance in the confinement unit by refusing to give back his food tray and using profanities.

44.     Various officers attempted to counsel with Rommell.  In preparation for the use of chemical agents, at approximately 4:40 p.m., an FDOC Captain reviewed Rommell's risk assessment form and called a nurse in the medical department, who indicated that there were no changes to Johnson's medical condition, despite the fact that Rommell had required medical intervention for an asthma attack that very afternoon.

45.     At approximately 4:45 p.m., the Captain contacted the Duty Warden, who authorized the use of chemical agents against Rommell.

46.     At approximately 5:09 p.m., the Captain, along with a handheld camera operator and a Sergeant armed with chemical agents, came to the front of Rommell's cell.

47.     The Captain gave Rommell a final order to return his food tray or chemical agents would be used.  Rommell complied and returned his tray.  The camera was turned off, and the officers left the front of Rommell's cell.

48.     At approximately 5:35 p.m., Rommell allegedly began yelling and using profanity while alone in his cell.  Despite the fact that Rommell was not hurting himself, threatening to hurt himself or any other person, or destroying any property, the Captain decided that Rommell should be sprayed with chemical agents.

49.     Only fifteen minutes later, at approximately 5:50 p.m., pursuant to FDOC policy, an FDOC Sergeant sprayed Rommell in the face, chest and body with chemical agents specifically designed to cause respiratory distress, while Rommell was alone in his locked cell.

50.     Five minutes later, at approximately 5:55 p.m., Rommell was sprayed with a second application of the same chemical agents while still alone in his locked cell, pursuant to FDOC policy.

51.     According to FDOC personnel, after the second application of the chemical agents, Rommell was no longer yelling.

52.     The Captain and a nurse then went to the front of Rommell's cell to order Rommell to "cuff-up" so that he could be removed for a cool water shower.  According to the Captain and the nurse, Rommell was verbally unresponsive.  While both initially indicated that Rommell moved his head in a manner that they believed indicated that he was refusing the cool water shower, in hindsight, the nurse indicated that Rommell may not have been refusing the shower, and instead may have been moving his head away from a pool of chemical agents which had collected on the floor.

53.     Pursuant to FDOC policy, the Captain then ordered the Sergeant, who was operating the handheld camera, to observe Rommell for two hours, and offer him a cool water shower every thirty minutes.  While FDOC policy mandates that this monitoring be done by correctional officers, the FDOC provides its officers – including the sergeant in question – with no training with respect to identifying respiratory distress, nor any training as to how to handle an inmate who may be suffering from an asthma attack or other symptoms of respiratory distress.

54.     At approximately 6:25 p.m., the Sergeant observed Rommell slump over, and used his radio to call the Captain, who had left the building.

55.     A few minutes later, the Captain arrived at the front of Rommell's cell.  The Captain attempted to engage Rommell verbally, but noted that Rommell was unresponsive. Noting that Rommell had defecated on himself at some point and that something was "not right,"

the Captain felt that Rommell needed immediate medical attention, and ordered additional staff to come to help him remove Rommell from his cell.

56.     At this time, Nurse Everett arrived at the front of Rommell's cell and confirmed the Captain's concerns.  She noted that Rommell's breathing was shallow, his nail beds were dusky, and his lips were blue.  In her medical opinion, it was obvious that Rommell needed to be removed from the cell and given a breathing treatment immediately.  He needed help.

57.     Officers then entered Rommell's cell, placed him on a handheld stretcher, and removed him from his cell.  He was brought to a small medical examination room right outside the quad.  Waiting in the medical examination rooms was Defendant Ogg, the Senior Nurse.

58.     At this point, in addition to Rommell's breathing, nail beds and lips, Rommell had bubbles of fluid coming out from his nose.

59.     Rommell was placed on the floor in obvious need of medical help.  Nurse Everett noted that Rommell was having significant breathing problems and was not getting enough oxygen.  However, Defendant Ogg was the Senior Nurse, and Nurse Everett was taking her instructions from her.

60.     Defendant Ogg had reviewed Rommell's medical file prior to her arrival in confinement, and was fully aware of both Rommell's asthma history as well as the fact that Rommell had required medical intervention for an asthma attack that very afternoon.  Defendant Ogg was further aware that chemical agents specifically designed to cause respiratory distress had just been applied to Rommell moments earlier, and that Rommell had been pulled out of his cell, unresponsive, on a stretcher, before being brought to her attention.

61.     Despite this knowledge, as well as Rommell's plainly obvious need for medical assistance – evidenced by his shallow breathing, dusky nail beds and blue lips – Defendant Ogg

intentionally and knowingly failed to provide Rommell with any actual medical treatment whatsoever.  Defendant Ogg did not order Rommell be taken immediately to the medical emergency room at the institution, nor did she call emergency medical services.

62.     Instead, Defendant Ogg wasted precious, potentially life-saving time applying a knuckle rub, a foot scraping, and placing ammonia under Rommell's nose, because she thought Rommell was faking his respiratory distress, and that by applying those techniques, he would cease his ruse.  Placing ammonia under Rommell's nose could serve no medical purpose in terms of assisting him with his respiratory distress, however, and could actually have exacerbated his symptoms.

63.     Eventually, Defendant Ogg ordered that Rommell be brought to the medical emergency room at the institution, despite the fact that she thought Rommell was fine.  Instead, Rommell was so far gone by that time, he had to be strapped to a wheelchair with bed sheets, as he could not hold himself up, and brought across the prison campus to the medical building.

64.     Again, precious time was wasted as Rommell was showered before he received any medical treatment whatsoever.  The shower took place to remove the chemical agents and feces from Rommell.  Defendant Ogg could have immediately provided Rommell with medical services she knew he needed, but she chose not to.  Defendant Ogg could have called emergency medical services (EMS), but she chose not to.  Defendant Ogg was not even present during the shower, having abandoned her patient when he most desperately needed her help.

65.     Instead of receiving medical treatment from Defendant Ogg, Rommell was placed underneath the shower, and propped up on the floor while correctional officers poured cups of water over him.  At some point during the shower, the correctional officers noticed that Rommell

was no longer breathing, and called for Defendant Ogg, who had left.  Rommell was then taken out of the shower, and brought into the medical emergency room, where CPR was begun.

66.     By that time, it was far too late.  At least twenty minutes had elapsed from the time that Rommell was first brought to Defendant Ogg in the medical examination room in confinement until he was provided with any medical treatment.

67.     It took another nineteen minutes from the time that CPR began until emergency medical services were finally contacted.

68.     Eventually, Washington County Emergency Medical Services arrived to transport Rommell to Bay Medical Center Emergency Department.

69.     Rommell was pronounced dead on arrival at Bay Medical Center Emergency Department, after suffering a death no different than drowning.

70.     When Rommell's body arrived at the Bay County medical examiner's office, it was saturated in chemical agents with brown/orange material on much of his body.

71.     The medical examiner determined Rommell's cause of death to be acute exacerbation of asthma associated with the inhalation of chemical agents.

72.     As a result of the FDOC's negligence and deliberate indifference to Rommell's need for a reasonable accommodation, and Defendant Ogg's deliberate indifference to Rommell's serious need for medical assistance, Rommell suffered a horrific death.

### *The FDOC Never Changed its Policies Despite Warnings from the CMA*

73.     The Correctional Medical Authority (hereinafter "CMA") was created by the Florida legislature to monitor and evaluate the quality of the care provided to inmates by the Defendant FDOC.  The CMA was created so federal court oversight of the Defendant FDOC

would end and a near three decade long class-action could be closed by then U.S. District Court Judge Susan Black.

74.     Several years prior to Rommell's death, the CMA identified the use of chemical agents against asthmatic inmates as a dangerous practice.

75.     The CMA's concern was discussed with Central Office staff from the Defendant FDOC.

76.     The CMA suggested corrective actions, including the training of staff regarding the contraindication of chemical agents with asthmatic inmates and the monitoring of uses of force to ensure that no chemical agents were administered to inmates with asthma or other contraindicated conditions.

77.     Defendant FDOC ignored the CMA's warnings and suggestions, and made no changes to its policy.  Current FDOC polices do not categorically exempt inmates with moderate to severe asthma, like Rommell, from non-spontaneous uses of chemical agents.

78.     As a result of the FDOC's refusal to heed the warnings of the CMA and its deliberate indifference to his disability, Rommell died needlessly.

### *Categorical Exceptions are Reasonable and Employed in Other Areas*

79.     A non-spontaneous use of force occurs when there is no emergency security situation.

80.     There are, however, categorical exceptions for the non-spontaneous use of chemical agents on inmates suffering from other disabilities and medical conditions.  For example, pursuant to FDOC policy, non-spontaneous uses of chemical agents are not used on inmates who are assigned to inpatient mental health care in an infirmary, transitional care unit,

{07051229;5}

crisis stabilization unit, corrections mental health institution, or other mental health treatment facility.

81.     Given that there are categorical exceptions to the FDOC's chemical agents rule for disabilities and medical conditions other than asthma, there are clearly feasible alternatives and reasonable accommodations available to address inmate misbehavior that will not pose a risk of harm to severely asthmatic inmates.

82.     Approved alternatives and reasonable accommodations to the use of chemical agents include, but are not limited to, electronic immobilization devices (tasers), cell extractions (batons), and rubber ball rounds.

83.     Defendant FDOC never implemented a categorical exception for severely asthmatic inmates, despite the knowledge of a need for one, and the reasonableness and necessity of such an exception and accommodation.

84.     As a result of all the aforementioned malfeasance on behalf of the Defendants, Rommell passed away, but not before he suffered what can only be described as drowning on land.

**Count One**

**<u>Negligence - Wrongful Death</u>**

85.     Plaintiff repeats and realleges paragraphs 1 through 84 as if fully set forth herein.

86.     Count One is against Defendant FDOC for the negligence of its employees, which resulted in the wrongful death of Rommell Johnson, and is brought pursuant to Florida's Wrongful Death Act, Sections 768.16-768.27, Florida Statutes.

87.     Defendant FDOC authorized its agents and employees to act for Defendant FDOC when they committed the negligent acts alleged herein.   Defendant FDOC's agents and

employees accepted the undertaking of acting on behalf of Defendant FDOC when they committed the negligent acts alleged herein. Defendant FDOC had control over its agents and employees when they committed the negligent acts alleged herein.

88.     The negligent acts of Defendant FDOC's agents and employees were committed while acting within the course and scope of their employ and/or agency with Defendant. Thus, Defendant FDOC is vicariously liable for the actions of its agents and employees when they committed the negligent acts alleged herein.

89.     Defendant FDOC owed Rommell a non-delegable duty to use reasonable care to ensure that Rommell was not sprayed with chemical agents in a non-spontaneous manner because of his vulnerability due to asthma.

90.     Defendant FDOC failed to perform its duty to use reasonable care to ensure that Rommell was properly designated as having a contraindication to the use of chemical agents, thereby abandoning Rommell.

91.     Defendant FDOC failed to perform its duty to use reasonable care to ensure Rommell's safety and well-being by, among other things:

A.     spraying Rommell with chemical agents, despite knowledge that he suffered from asthma;

B.     failing and intentionally refusing to establish policy and procedures whereby inmates identified as being asthmatic are designated as being contraindicated for the use of chemical agents, and assigned alternative means of non-spontaneous use of force, when such a policy and procedure was necessary to reasonably care for Rommell;

C.   failing and intentionally refusing to train Defendant FDOC employees regarding the Defendant FDOC's obligation to provide asthmatic inmates with reasonable alternatives and accommodations to the use of chemical agents;

E.   failing and intentionally refusing to consider Rommell's asthma when determining the type of non-spontaneous use of force to use on him; and

F.   failing and intentionally refusing to investigate what alternatives to the use of chemical agents Rommell would have been reasonable.

92.   As a direct and proximate result of Defendant FDOC's, its employees', and agents' failure to perform their duty to use reasonable care to ensure Rommell's safety and well-being, he died.

93.   It was reasonably foreseeable that harm would befall Rommell either directly or indirectly as a result of the aforementioned actions and omissions of Defendant FDOC, its employees, and agents.

WHEREFORE, on this Count One, as a result of the tragic and untimely death of Rommell Johnson, the Survivor of and the Estate of Rommell Johnson have sustained the following damages, and therefore seek same from Defendant Florida Department of Corrections:

A.   The Estate of Rommell Johnson has sustained the following damages:

1.   funeral and burial expenses incurred as a result of the death of Rommell Johnson that have become a charge against his Estate or that were paid on his behalf;

2.   loss of prospective net Estate accumulations; and

3.      loss of earnings of Rommell Johnson from the date of his death, less loss

support of his Survivor excluding contributions in kind with interest.

B.      Evelyn Brady, as the survivor of Rommell Johnson, has sustained the following

damages:

1.      loss of support and services of her son;

2.      mental pain and suffering from the date of injury and continuing for the

remainder of her life; and

3.      funeral expenses due to the death of Rommell Johnson.

In conclusion, Plaintiff respectfully requests that the Court award Plaintiff the

aforementioned damages; any and all other compensatory damages suffered by Plaintiff; and

such other and further relief as the Court deems just and equitable.

### Count Two

### <u>Violations of Title II of the Americans with Disabilities Act</u>

94.     Plaintiff repeats and realleges paragraphs 1 through 84 as if fully set forth herein.

95.     This Count Two is a claim for disability discrimination against Defendant FDOC

for violating Title II (public entities) of the Americans with Disabilities Act, 42 U.S.C. § 12101

et seq., (hereinafter the "ADA") which provides in pertinent part at 42 U.S.C. § 12132:

> No qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the
> benefits of the services, programs, or activities of a public entity,
> or be subjected to discrimination by such entity.

Title II of the Act prohibits, among other things:

- limiting a qualified individual's enjoyment of any right,
  privilege, advantage, or opportunity enjoyed by others receiving
  an aid, benefit, or service of an agency; and

- subjecting a qualified individual to discrimination under any program or activity conducted by an agency.

28 C.F.R. § 39.130.

96.     Rommell was disabled as defined at 42 U.S.C. § 12102(2), as he suffered a physical impairment that substantially limited one or more of his major life activities, including, but not limited to, breathing.

97.     Rommell was a "qualified individual" as defined at 42 U.S.C. § 12131(2):

"Qualified Individual" means an individual with a disability who meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the entity (with or without regard to any auxiliary aids or modifications).

98.     Defendant FDOC is a public entity that has violated Title II of the ADA.

99.     Defendant's prison, Northwest Florida Reception Center, is a facility and its operation comprises a program and service for purposes of Title II of the ADA.

100.    Defendant FDOC authorized its agents and employees to act for Defendant FDOC when they committed the ADA violations alleged herein.  Defendant FDOC's agents and employees accepted the undertaking of acting on behalf of defendant FDOC when they committed the ADA violations alleged herein.  Defendant FDOC had control over its agents and employees when they committed the ADA violations alleged herein.

101.    The ADA violations alleged herein and committed by Defendant FDOC's agents and employees were done while acting within the course and scope of their employ and/or agency with Defendant FDOC.  Thus, Defendant FDOC is vicariously liable for the actions of its agents and employees when they committed the ADA violations alleged herein.

102.    Rommell's need for a reasonable accommodation was known and obvious.

{07051229;5}

- 20 -

103.   Defendant FDOC, its employees, and agents knew and/or should have known of Rommell's need for a reasonable accommodation.

104.   Defendant FDOC, its agents and employees, acted intentionally and/or with deliberate indifference to Rommell's need for a reasonable accommodation by, among other things:

A.   spraying Rommell with chemical agents, despite knowledge of his disability;

B.   failing and intentionally refusing to establish policy and procedures whereby inmates identified as being asthmatic are designated as being contraindicated for the use of chemical agents, and assigned alternative means of non-spontaneous use of force when such a policy and procedure was necessary to reasonably accommodate Rommell's disability;

C.   failing and intentionally refusing to train Defendant FDOC employees regarding the Defendant FDOC's obligation to provide asthmatic inmates with reasonable accommodations for their disability under the ADA;

D.   failing and intentionally refusing to consider Rommell's particular disability when determining the type of non-spontaneous use of force to use on him;

E.   failing and intentionally refusing to investigate what accommodations for Rommell would have been reasonable; and

F.   failing and intentionally refusing to reasonably accommodate Rommell's disability.

105.    In sum, Defendant FDOC, its agents and employees, intentionally used a form of discipline that, because of Rommell's disability, subjected him to a substantial risk of death that (1) was not faced by other inmates and (2) could have been avoided by a reasonable accommodation.

106.    As a direct and proximate result of defendant FDOC's, its employees', and agents' failure and intentional refusal to provide Rommell with an accommodation for his disability, he died.

WHEREFORE, on this Count Two, as a result of the tragic and untimely death of Rommell Johnson in violation of the ADA, the Survivor of and the Estate of Rommell Johnson have sustained the following damages, and therefore seek same from Defendant Florida Department of Corrections:

A.    The Estate of Rommell Johnson has sustained the following damages:

1.   funeral and burial expenses incurred as a result of the death of Rommell Johnson that have become a charge against his Estate or that were paid on his behalf;

2.   loss of prospective net Estate accumulations; and

3.   loss of earnings of Rommell Johnson from the date of his death, less loss support of his Survivor excluding contributions in kind with interest.

B.    Evelyn Brady, as the mother of Rommell Johnson, has sustained the following damages:

1.   loss of support and services of her son;

2.   mental pain and suffering from the date of injury and continuing for the remainder of her life; and Rommell Johnson.

{07051229;5}

    C.      The Estate of Rommell Johnson and Evelyn Brady have sustained the following damages:

    1.  hedonic damages based on the decedent's loss of enjoyment of life.

In sum, Plaintiff respectfully requests that the Court award Plaintiff the aforementioned damages, any and all other compensatory and hedonic damages suffered by Plaintiff, Plaintiff's attorneys' fees and costs in this action pursuant to 42 U.S.C. § 12205; declare the actions of the Defendant Florida Department of Corrections complained herein to be in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and grant such other and further relief as the Court deems just and equitable.

## Count Three

## <u>Violations of § 504 of the Rehabilitation Act</u>

107.    Plaintiff repeats and realleges paragraphs 1 through 84 as if fully set forth herein.

108.    This Count Three is a claim for disability discrimination against Defendant FDOC for the violation of Section 504 of the Rehabilitation Act (hereinafter the "Rehabilitation Act").

109.    Defendant FDOC was and is a recipient of federal funds at all times relevant.

110.    Rommell was disabled, as he suffered a physical impairment that substantially limited one or more of his major life activities, including, but not limited to, breathing.

111.    Rommell was a "qualified individual" pursuant to the Rehabilitation Act.

112.    Defendant FDOC is a public entity that has violated the Rehabilitation Act.

113.    Defendant's prison, Northwest Florida Reception Center, is a facility and its operation comprises a program and service for purposes of the Rehabilitation Act.

114.    Defendant FDOC authorized its agents and employees to act for Defendant FDOC when they committed the Rehabilitation Act violations alleged herein.   Defendant FDOC's

agents and employees accepted the undertaking of acting on behalf of defendant FDOC when they committed the Rehabilitation Act violations alleged herein.  Defendant FDOC had control over its agents and employees when they committed the Rehabilitation Act violations alleged herein.

115.    The Rehabilitation Act violations alleged herein and committed by Defendant FDOC's agents and employees were done while acting within the course and scope of their employ and/or agency with Defendant FDOC.  Thus, Defendant FDOC is vicariously liable for the actions of its agents and employees when they committed the Rehabilitation Act violations alleged herein.

116.    Rommell's need for a reasonable accommodation was known and obvious.

117.    Defendant FDOC, its employees, and agents knew and/or should have known of Rommell's need for a reasonable accommodation.

118.    Defendant FDOC, its agents and employees, acted intentionally and/or with deliberate indifference to Rommell's need for a reasonable accommodation by, among other things:

> A.    spraying Rommell with chemical agents, despite knowledge of his disability;

> B.    failing and intentionally refusing to establish policy and procedures whereby inmates identified as being asthmatic are designated as being contraindicated for the use of chemical agents, and assigned alternative means of non-spontaneous use of force when such a policy and procedure was necessary to reasonably accommodate Rommell's disability;

C.      failing and intentionally refusing to train Defendant FDOC employees regarding the Defendant FDOC's obligation to provide asthmatic inmates with reasonable accommodations for their disability under the Rehabilitation Act;

D.      failing and intentionally refusing to consider Rommell's particular disability when determining the type of non-spontaneous use of force to use on him;

E.      failing and intentionally refusing to investigate what accommodations for Rommell would have been reasonable; and

F.      failing and intentionally refusing to reasonably accommodate Rommell's disability.

119.    In sum, Defendant FDOC, its agents and employees, intentionally used a form of discipline that, because of Rommell's disability, subjected him to a substantial risk of death that (1) was not faced by other inmates and (2) could have been avoided by a reasonable accommodation.

120.    As a direct and proximate result of defendant FDOC's, its employees', and agents' failure and intentional refusal to provide Rommell with an accommodation for his disability, he died.

WHEREFORE, on this Count Three, as a result of the tragic and untimely death of Rommell Johnson in violation of the Rehabilitation Act, the Survivor of and the Estate of Rommell Johnson have sustained the following damages, and therefore seek same from Defendant Florida Department of Corrections:

A.    The Estate of Rommell Johnson has sustained the following damages:

1.   funeral and burial expenses incurred as a result of the death of Rommell Johnson that have become a charge against his Estate or that were paid on his behalf;

2.   loss of prospective net Estate accumulations; and

3.   loss of earnings of Rommell Johnson from the date of his death, less loss support of his Survivor excluding contributions in kind with interest.

B.    Evelyn Brady, as the mother of Rommell Johnson, has sustained the following damages:

1.   loss of support and services of her son;

2.   mental pain and suffering from the date of injury and continuing for the remainder of her life; and Rommell Johnson.

D.    The Estate of Rommell Johnson and Evelyn Brady have sustained the following damages:

1.   hedonic damages based on the decedent's loss of enjoyment of life.

In sum, Plaintiff respectfully requests that the Court award Plaintiff the aforementioned damages, any and all other compensatory and hedonic damages suffered by Plaintiff, Plaintiff's attorneys' fees and costs in this action pursuant to 29 U.S.C. § 794a; declare the actions of the Defendant Florida Department of Corrections complained herein to be in violation of Section 504 of the Rehabilitation Act, and grant such other and further relief as the Court deems just and equitable.

**Count Four**

**Deliberate Indifference to Rommell Johnson's**
**Serious Medical Needs By Vivan Ogg**

121.    Plaintiff repeats and realleges paragraphs 1 through 84 as if fully set forth herein.

122.    Plaintiff's claim for relief on this Count Four is predicated upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Eighth and Fourteenth Amendments to the U.S. Constitution and the laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

123.    At all times material to this action, Defendant Ogg was employed by Defendant FDOC.  All actions performed by Defendant Ogg were done under color of state law and constitute state action.

124.    Defendant Ogg deliberately disregarded the immediate and serious threat to Rommell Johnson's health and well-being, and exhibited deliberate and callous indifference to his serious medical needs, by failing to provide him with medical treatment for at least twenty-minutes after the need for such treatment was obvious.

125.    With full knowledge of Rommell Johnson's asthma history and the fact that chemical agents had been applied to him; and having observed Rommell Johnson in obvious respiratory distress, Defendant Ogg intentionally and knowingly failed to take any action whatsoever to provide Rommell Johnson with the very medical care she knew was needed.

126.    Defendant Ogg observed Rommell Johnson in obvious respiratory distress, and was well aware of Rommell Johnson's asthma history and the fact that chemical agents known to cause respiratory distress had been applied to him; accordingly, Defendant Ogg intentionally and

knowingly failed to provide Rommell Johnson with the needed medical care, and for all practical purposes, simply abandoned Rommell Johnson as a patient.

127.    Defendant Ogg knew at all times material to this action that there was a substantial risk that Rommell Johnson would die without the medical care he so urgently needed, that Rommell Johnson's death was reasonably foreseeable, and that the threat of this was imminent and immediate.

128.    Defendant Ogg deliberately disregarded the immediate and serious threat to Rommell Johnson's health and well-being and exhibited deliberate indifference and callous indifference to his serious medical needs by refusing to timely treat him, because she did not believe his symptoms were real, in that:

> A.    with full knowledge of Rommell Johnson's asthma history and the fact that chemical agents had been applied to him; and having observed Rommell Johnson in obvious respiratory distress; and given that his death was reasonably foreseeable, Defendant Ogg abandoned Rommell Johnson as her patient;

> B.    with full knowledge of Rommell Johnson's asthma history and the fact that chemical agents had been applied to him; and having observed Rommell Johnson in obvious respiratory distress, it was incumbent on Defendant Ogg to take some action to provide Rommell Johnson with emergency medical care and she failed to do so; and

> C.    with full knowledge of Rommell Johnson's asthma history and the fact that chemical agents had been applied to him; and having observed

Rommell Johnson in obvious respiratory distress, Defendant Ogg's actions in failing to provide him with any medical care for over twenty minutes was so grossly substandard, incompetent, and inadequate as to fairly be characterized as medical care so cursory as to amount to no medical care at all.

129.    In light of the aforementioned, Rommell Johnson suffered from both an objectively and subjectively substantial risk of serious harm while under the care and supervision of Defendant Ogg; Defendant Ogg reacted to this risk in an objectively and subjectively unreasonable manner.

130.    It is more likely than not that the failures of Defendant Ogg as alleged above were one of the causes of Rommell Johnson's death.

131.    As a direct and proximate result of Defendant Ogg's deliberate indifference to Rommell Johnson's serious medical needs, Rommell Johnson died on June 3, 2010.

132.    Defendant Ogg acted with evil intent, malice, wantonness, and/or lucre when she was deliberately indifferent to Rommell Johnson's serious medical needs.

WHEREFORE, on this Count Four, as a result of Defendant Ogg's violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, which caused the tragic and untimely death of Rommell Johnson, the Survivor of and the Estate of Rommell Johnson have sustained the following damages, and therefore seek same from Defendant Ogg:

A.     The Estate of Rommell Johnson has sustained the following damages:

   1.   funeral and burial expenses incurred as a result of the death of Rommell
        Johnson that have become a charge against his Estate or that were paid on his
        behalf;

   2.   loss of prospective net Estate accumulations; and

   3.   loss of earnings of Rommell Johnson from the date of his death, less loss
        support of his Survivor excluding contributions in kind with interest.

B.     Evelyn Brady, as the mother of Rommell Johnson, has sustained the following
       damages:

   1.   loss of support and services of her son;

   2.   mental pain and suffering from the date of injury and continuing for the
        remainder of her life; and Rommell Johnson.

E.     The Estate of Rommell Johnson and Evelyn Brady have sustained the following
       damages:

   1.   hedonic damages based on the decedent's loss of enjoyment of life.

In sum, Plaintiff respectfully requests that the Court award Plaintiff the aforementioned damages, any and all other compensatory and hedonic damages suffered by Plaintiff, punitive damages, Plaintiff's attorneys' fees and costs in this action pursuant to 42 U.S.C. § 1988; declare the actions of Defendant Ogg complained herein to be in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, and grant such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands trial by jury on all issues that can be heard by a jury.

{07051229;5}

Respectfully submitted,

Randall C. Berg, Jr., Esq.
Fla. Bar No. 318371
Joshua A.  Glickman, Esq.
Fla. Bar No. 43994
Shawn A. Heller, Esq.
Fla. Bar No. 46346
Dante Trevisani, Esq.
Florida Bar No. 72912

Florida Justice Institute, Inc.
100 S.E. 2nd Street
3750 Miami Tower
Miami, Florida  33131-2309
305-358-2081
Fax 305-358-0910
rberg@floridajusticeinstitute.org

Kristen Cooley Lentz, Esq.
Fla. Bar. No. 649635
Cassandra J. Capobianco, Esq.
Fla. Bar No. 614734
Florida Institutional Legal Services
14260 W. Newberry Rd - #412
Newberry, Florida 32669
352-375-2494
Fax 352-331-5202
klentz@filsinc.org


By:      _s/Randall C. Berg, Jr._
         Randall C. Berg, Jr., Esq.
         Attorneys for the Plaintiff

{07051229;5}

- 31 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 20, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:____*s/Randall C. Berg, Jr.*_____
Randall C. Berg, Jr.

## SERVICE LIST
### Case No. 4:11-cv-00510-RH-WCS
### Northern District of Florida, Tallahassee Division

**Via CM/ECF**

William Peter Martin
Fla. Bar No. 843024
Dennis, Jackson, Martin & Fontela
P.O. Box 15589
Tallahassee, Florida 323175589
T. 850.422.3345
F. 850.222.0103
peter@djmf-law.com

*Counsel for the Defendants*

{07051229;5}

- 32 -